USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/4/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

CHERRY ANN JONES,

                              Plaintiff,

          -against-

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

-----------------------------------------------------------------X

22-CV-10571 (SN)

**OPINION AND ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

Cherry Ann Jones seeks judicial review of the final determination of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. See 42 U.S.C. § 405(g). Jones moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The Commissioner opposes Jones's motion. Jones's motion is DENIED.

## BACKGROUND

**I.    Administrative History**

Jones applied for DIB on February 5, 2021. ECF No. 11, Administrative Record ("R.") 15. She alleged that she was disabled beginning June 29, 2020, due to various mental health and medical issues, including a rotator cuff injury. Id. at 286, 290. Her application was first denied on September 10, 2021, and then again upon reconsideration on December 29, 2021. Id. at 153, 171. Jones then requested a hearing before an administrative law judge ("ALJ") to review her case. Id. at 181. Jones appeared before ALJ Eric Eklund for a hearing on June 24, 2022. Id. at 44. On July 18, 2022, the ALJ issued a decision granting Jones's claim for the period between June 29, 2020, and August 31, 2021, and denying Jones's claim for the period between September 1,

2021, and the date of the ALJ's decision. Id. at 14-33. On October 17, 2022, the Appeals Council denied Jones's request for review, making the ALJ's decision final. Id. at 1-3.

**II.     Jones's Civil Case**

Jones filed her complaint on December 14, 2022, seeking review of the ALJ's decision and requesting that the Court either grant her maximum DIB or remand the case for further proceedings. ECF No. 1. The Commissioner answered by filing the administrative record, and Jones moved for judgment on the pleadings. ECF Nos. 11, 17. Jones argues that the ALJ erred by determining her Residual Functional Capacity ("RFC") using his "own lay opinion of the medical evidence" and by improperly ignoring her hearing testimony. ECF No. 17, Plaintiff's Memorandum of Law ("Pl. Br.") at 17-18. The Commissioner responds that the ALJ's RFC determination was free from error and was supported by the relevant medical and testimonial evidence. See ECF No. 20, Defendant's Memorandum of Law ("Def. Br.") at 14.

On January 9, 2023, the parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c). ECF No. 8.

**III.    Factual Background**

Jones's arguments on appeal are limited to the ALJ's determinations about her right shoulder and arm movement. Accordingly, a more detailed summary of the medical record evidence is unwarranted, and the Court adopts the parties' recitations of Jones's medical record evidence.

Jones was born on November 1, 1971, and was 48 years old at the time of the alleged onset of her disability in 2020. R. 286. She has a high school education and has taken some college-level accounting courses. Id. at 49, 296. She is a licensed nursing assistant and has worked as a home health aide. Id. at 50, 291. From August 2008 until June 2020, Jones worked

for the New York City Transit Authority ("Transit"). Id. at 291. For Jones's first five years with Transit, she counted the number of riders on City buses. Id. at 67-68. Jones then switched to laminating posters. Id. Her final role with Transit involved posting delay and interruption notices on subway turnstiles. Id. Throughout Jones's 12 years at Transit, she also took extra weekend shifts guiding passengers towards shuttle buses when trains were out of service. Id. at 69.

On June 29, 2020, while putting up posters at work, Jones reached with her right arm and "noticed immediate pain in her right shoulder, neck and upper back." Id. at 1656. The injury immediately disrupted her ability to move her neck, carry objects, bathe, wash her hair, and reach overhead and behind her back with her right arm. Id. at 995, 1656. Weeks after sustaining the injury, Jones underwent multiple MRIs. An MRI of Jones's spine revealed that she had one disc herniation and two disc bulges. Id. at 452. A separate MRI of her right shoulder revealed tendinopathy, as well as tendon and labrum tears in her rotator cuff. Id.

Jones's pain and functional limitations persisted, despite several treatment attempts. She tried physical therapy, acupuncture, cortisone shots, and over-the-counter pain relievers. Id. at 56, 487. She also underwent two cervical medial branch block procedures and one cervical radiofrequency ablation procedure. Id. at 1654. While these interventions provided some pain relief, none fully resolved her symptoms. Id. at 509. After exhausting other treatment options, Dr. Gabriel Dassa, D.O., performed arthroscopic surgery on Jones's right shoulder on April 23, 2021. Id. at 635.

On four separate occasions following Jones's surgery, various physicians measured her right shoulder's range of movement. SSA consultative physician Manuel Paz, M.D., measured Jones's right shoulder movement on June 23, 2021; Jones's surgeon, Dr. Dassa, measured her shoulder movement at follow-up appointments on July 22, 2021, and February 24, 2022; and

3

SSA consultative physician Dr. Guttman measured Jones's right shoulder movement on August 31, 2021. Id. at 967, 974, 978, 1641. The measurements from those four evaluations are shown below in Table 1.

**Table 1: Jones's Physician-Measured Right Shoulder Movement (in Degrees)**

| Range of Motion | Normal Range[1] | June 23, 2021 (Dr. Paz) | July 22, 2021 (Dr. Dassa) | Aug. 31, 2021 (Dr. Guttman) | Feb. 24, 2022 (Dr. Dassa) |
|---|---|---|---|---|---|
| Flexion | 170-180 | Not Recorded ("NR") | 155 | 180 | 150 |
| Abduction | 170-180 | 90 | 150 | 160 | 150 |
| Internal Rotation | 60-70 | 20 | 45 | 60 | 40 |
| External Rotation | 80-90 | 45 | 70 | 80 | 70 |
| Extension | 30-60 | NR | 20 | 60 | 10 |
| Adduction | 40 | 15 | 30 | NR | 20 |

At Dr. Paz's June 23, 2021 evaluation, he opined that Jones had "marked limitations for heavy lifting, carrying, pushing, pulling, and reaching overhead with the right shoulder." Id. at 968. Similarly, at Dr. Guttman's August 31, 2021 evaluation, he noted that Jones "cannot lift more than 25 pounds and cannot do any overhead lifting." Id. at 979. Dr. Guttman also noted that "impingement and cuff tear signs were not present" and that Jones could "perform all activities of daily living including working with the above restrictions." Id. At Jones's February 2022 follow-up appointment with Dr. Dassa, she told him that she "continue[d] to have maintained improvement in her shoulder," but she presented with a more limited range of shoulder movement than at her previous two measurements. Id. at 1641; see Table 1.

---

[1] The normal ranges of motion provided by Dr. Dassa and Dr. Guttman differ slightly, and Dr. Paz provided no normal range. Because Dr. Dassa and Dr. Guttman provided different ranges, the "Normal Range" values in Table 1 represent the numbers provided by both doctors. The lower end (e.g., 170 degrees for flexion) represents the normal range of motion provided by Dr. Dassa. R. 1641. The higher end (e.g., 180 degrees for flexion) represents the normal range of motion provided by Dr. Guttman. Id. at 978.

Following her shoulder surgery, Jones regularly attended physical therapy. At those appointments, Jones's physical therapist measured her right shoulder movement. Those measurements, shown in Table 2, demonstrate that Jones's right shoulder movement steadily improved following her surgery. By February 9, 2022, all of Jones's shoulder movements were either normal or nearly normal. Id. at 1639. At a physical therapy appointment on June 21, 2021, while still recovering from shoulder surgery and while experiencing very limited right shoulder movement, Jones told her physical therapist that she was able to "do reaching activities with ease." Id. at 1131.

**Table 2: Jones's Physical Therapist-Measured Right Shoulder Movement (in Degrees)**

| Range of Motion | Normal Range[2] | May 11, 2021, through June 21, 2021 | June 22, 2021, through Oct. 7, 2021 | Oct. 12, 2021, through Feb. 8, 2022 | Feb. 9, 2022 |
|---|---|---|---|---|---|
| Flexion | 180 | 80 | 128 | 165 | 170 |
| Abduction | 180 | 70 | 100 | 165 | 170 |
| Internal Rotation | 70 | 40 | 45 | 50 | Normal |
| External Rotation | 90 | 30 | 35 | Normal | Normal |
| Extension | 60 | 30 | 33 | NR | NR |

## IV. The ALJ's Decision

At step one, the ALJ determined that Jones had not engaged in any substantial gainful activity since June 29, 2020, the date of her workplace injury. R. 19.

At step two, the ALJ found that, from June 29, 2020, through August 31, 2021, Jones had the following severe impairments: "status post right arthroscopic surgery for rotator cuff injury; right shoulder degenerative joint disease; right shoulder tendinopathy; multilevel cervical

---

[2] The normal ranges in Table 2 are provided by Jones's physical therapist. R. 1620.

degenerative disc disease; obesity; bipolar depressive disorder; anxiety disorder; post-traumatic stress disorder (PTSD); and intermittent explosive personality disorder." Id. at 19.

At step three, the ALJ determined that Jones's impairments or any combination thereof did not meet or medically equal the severity of a listed impairment in the applicable regulations ("listings"). Id. at 20; see 20 C.F.R. Pts. 404.1520(d), 404.1525, 404.1526. Specifically, the ALJ found that the requirements of listings 1.15, 1.16, 1.18, 12.04, and 12.06[3] were not met or medically equaled. Id. at 20.

For the period between June 29, 2020, and August 31, 2021, the ALJ found that Jones possessed the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), with these additional limitations:

> She could never climb ladders, ropes, or scaffolds. She could never crawl. She could occasionally stoop and crouch. She could occasionally climb ramps and stairs. She could less than occasionally kneel. She could flex, extend, and rotate her neck up to 80% of normal range of motion. With her right dominant upper extremity, she could occasionally push and/or pull, and reach. With her right dominant upper extremity, she could never overhead reach. She had to avoid excessive vibration to her neck and right upper extremity. She had to avoid moving machinery and unprotected heights. She could not drive in the work setting. She was limited to performing simple, routine repetitive tasks. Her work had to be in a low stress job defined as limited to occasional decision-making and occasional changes in work setting. She could have less than occasional interaction with the public. She cannot perform tandem task. She could occasionally interact with co-workers and supervisors.

Id. at 21.

At step four, the ALJ found that Jones had past relevant work as a sign poster, bus attendant, printer/plastic, and passenger service rep. Id. at 25. The ALJ found that the demands of these roles exceeded Jones's RFC. Id.

---

[3] Respectively: "disorder of the skeletal spine resulting in compromise of the nerve root," "lumbar spinal stenosis resulting in compromise of the cauda equina," "abnormality of a major joint in any extremity," "depressive, bipolar and related disorders," and "anxiety and obsessive-compulsive disorders."

At step five, the ALJ concluded that, from June 29, 2020, through August 31, 2021, there were no jobs existing in significant numbers in the national economy that Jones could perform. Id. at 25. Accordingly, the ALJ concluded that Jones was disabled during that period. Id. at 26.

After concluding that Jones was disabled for the period between June 29, 2020, and August 31, 2021, the ALJ used an eight-step process to determine whether, after September 1, 2021, Jones's symptoms improved to the extent that she was no longer disabled.

At step one of the eight-step process, the ALJ again concluded that Jones had not engaged in substantial gainful activity since sustaining her workplace injury. At step two, the ALJ found that Jones's impairments or any combination thereof still did not meet or medically equal the severity of a listed impairment in the applicable regulations. Id. at 26-27. At step three, the ALJ found that Jones had experienced "medical improvement" following her right shoulder surgery. Id. at 28. At step four, the ALJ found that Jones's medical improvement related to her ability to work. Id. Because the ALJ found medical improvement, he did not consider step five. At step six, the ALJ found that, after September 1, 2021, Jones's impairments continued to be severe. Id. at 26.

The ALJ determined Jones's residual functional capacity for the period between September 1, 2021, and the date of the ALJ's decision. The ALJ found that for that period, Jones had a nearly identical RFC to the period between June 29, 2020, and August 31, 2021, except that the later RFC allowed for frequent, rather than occasional, reaching. Id. at 28. At step seven, the ALJ found that, despite Jones's medical improvement after September 1, 2021, the demands of her previous jobs still exceeded her RFC. Id. at 31-32.

At step eight, the ALJ concluded that from September 1, 2021, through the date of the decision, there were jobs existing in significant numbers in the national economy that Jones

could perform, due to her medical improvement. Id. at 32. In reaching his conclusion, the ALJ relied upon the testimony of a vocational expert, who opined that an individual with Jones's second RFC – the RFC that allowed for frequent reaching – would be able to work as a retail marker, a mail clerk, or a copy machine operator, with 136,783, 12,371, and 6,168 jobs existing in the national economy, respectively. Id.

Because the ALJ found that Jones was capable of successfully adjusting to other work that existed in significant numbers in the national economy for the period between September 1, 2021, and the date of the decision, he concluded that Jones was not disabled during that period. Id. at 33.

## DISCUSSION

### I.  Standard of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). An ALJ's determination may be set aside only if it is based upon legal error, or if it is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Balsamo v. Chater, 142 F.3d 75, 79 (2d Cr. 1998)).

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Commissioner's findings as to any fact supported by substantial evidence are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995); see also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to

be made by the factfinder."). Therefore, if substantial evidence supports the ALJ's final decision, the Court must grant judgment in favor of the Commissioner, even if substantial evidence also supports the plaintiff's position. See Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise.") (emphasis in original) (citations and internal quotation marks omitted). Although deferential to an ALJ's findings, a disability determination must be reversed or remanded if it contains legal error or is not supported by "substantial evidence." See Rosa, 168 F.3d at 77.

## II. Definition of Disability

A claimant is disabled under the Act if they demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). A claimant will be found to be disabled only if their "impairments are of such severity that [they are] not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." Id. § 423(d)(2)(A).

An ALJ must proceed through a five-step process to make a disability determination. See 20 C.F.R. § 404.1520. The steps are followed in order; if it is determined that the claimant is or

is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. See id. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (quoting Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999)).

Even when the ALJ concludes, after the five-step process, that a claimant is disabled, "benefits are no longer justified" when "the claimant's condition improves to the point where he or she is able to engage in substantial activity." De Leon v. Sec'y of Health & Human Serv., 734 F.2d 930, 937 (2d Cir. 1984). To determine whether a claimant's symptoms have improved to the extent that the claimant is no longer disabled, the ALJ must proceed through this eight-step process:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether any of the claimant's impairments meets or equals the severity of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations; (3) if not, whether there has been a "medical improvement" demonstrated by a decrease in medical severity; (4) if so, whether the medical improvement was related to the claimant's ability to do work (i.e., whether there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination); (5) if there has been no finding of medical improvement at step three, or if any medical improvement was found not to relate to an ability to work at step four, whether the exceptions listed in paragraphs (d) and (e) of the relevant section apply; (6) if medical improvement is shown to be related to ability to do work, or if one of the relevant exceptions apply, whether all of the claimant's current impairments in combination are severe; (7) if so, whether claimant can perform previous work

> based upon an assessment of the claimant's residual functional capacity considering all of the claimant's current impairments; and (8) if claimant is unable to perform past work, whether, given claimant's residual functional capacity and considering the claimant's age, education, and past work experience, other work exists that the claimant can perform.

McDonagh v. Acting Comm'r of Soc. Sec., No. 16-cv-08698 (VSB) (KHP), 2017 WL 9286987, at *10 (S.D.N.Y. Nov. 27, 2017) (citing 20 C.F.R. § 404.1594(f)(1)-(8)).

For the five-step process, the claimant bears the burden of proof as to steps one, two, three, and four; the Commissioner bears the burden as to step five. Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013). For the eight-step medical improvement process, "the burden is with the agency to prove that the claimant is no longer disabled." Milliken v. Saul, No. 19-cv-09371 (PED), 2019 WL 1030606, at *33 (S.D.N.Y. Mar. 17, 2021).

### III. Analysis

Jones argues that the ALJ erred by finding that her right shoulder condition improved by September 1, 2021. Specifically, Jones argues that in making that determination, the ALJ ignored medical evidence in favor of his own lay opinion and ignored Jones's testimony about being unable to use her right arm. Pl. Br. 15-18.

#### A.     Medical Improvement

Jones argues that substantial evidence does not support the ALJ's conclusion that her arm condition improved by September 1, 2021. Jones asserts that, contrary to the ALJ's RFC finding, she was not able to frequently reach with her right arm during the period between September 1, 2021, and the date of the ALJ's decision.

"After an individual has been found entitled to such benefits . . . [her] benefits may be terminated if there is substantial evidence that the impairment has improved to such an extent that [s]he is now able to work." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002). The ALJ

relied on substantial evidence to conclude that Jones's medical condition improved by September 1, 2021, such that she could frequently reach with her right arm. Specifically, the ALJ relied on an August 31, 2021 assessment by Dr. Guttman, longitudinal physical therapy records, and a February 24, 2022 assessment by Dr. Dassa. At the August 31, 2021 assessment, Dr. Guttman found that all of Jones's right shoulder movements fell within either the normal or nearly normal range. R. 978. As shown in Table 2, Jones's longitudinal physical therapy records show steady increases in her right shoulder movement, culminating in nearly normal right shoulder movement by February 2022. Finally, at Jones's February 2022 follow-up appointment with Dr. Dassa, she told Dr. Dassa that she "continue[d] to have maintained improvement in her shoulder." Id. at 1641. Because substantial evidence supported the ALJ's determination of medical improvement, the ALJ's determination did not constitute error.

Jones argues that the ALJ relied on his own lay opinion, rather than medical evidence, when formulating an RFC that limited Jones to frequent reaching with her right arm. To establish an RFC, an ALJ should consider "the medical and other evidence in the record," but ultimately, "an RFC finding is administrative in nature, not medical, and its determination is within the province of the ALJ." Curry v. Comm'r of Soc. Sec., 855 F. App'x 46, n.3 (2d Cir. 2021). As described above, to find that Jones's right shoulder mobility improved, the ALJ relied on measurements of Jones's right shoulder movement made by physicians and physical therapists. The ALJ then used that medical evidence to conclude, logically, that with greater arm mobility came an increased ability to reach. Accordingly, the ALJ properly used medical evidence to inform his administrative RFC determination.

Jones argues that the ALJ improperly relied on Dr. Guttman's assessment to conclude that Jones could frequently reach because it was "silent regarding Ms. Jones's ability to

frequently reach with her right upper extremity." Pl. Br. at 17. In Dr. Guttman's assessment, he noted that, aside from overhead lifting and lifting more than 25 pounds, Jones could "perform all activities of daily living." R. 979. Because Dr. Guttman omitted non-overhead reaching from his list of Jones's limitations, it was reasonable for the ALJ to infer that, in Dr. Guttman's opinion, Jones could reach frequently with her right arm.

Jones further argues that the ALJ improperly ignored evidence demonstrating that she cannot reach with her right arm. But some of the medical evidence cited by Jones is actually consistent with the ALJ's RFC determination. For example, Jones points out that on December 15, 2021, she reported constant and sharp right shoulder pain that was aggravated by reaching overhead, bathing, and brushing and washing her hair. Id. at 1611. The ALJ's RFC, however, properly accommodates Jones's documented inability to reach overhead. Id. at 28. Jones also argues that the ALJ ignored her reports of shoulder pain. But rather than ignoring Jones's reports of pain, the ALJ credited such reports and formulated an RFC designed to minimize Jones's pain. Id. at 24 ("Limiting her driving in work setting is appropriate to reduce the risk of exacerbating pain in her neck or right shoulder.").

Jones also cites some evidence that does contradict the ALJ's conclusion that she could frequently reach with her right arm. The deferential substantial evidence standard, however, "means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise." Brault, 683 F.3d at 448. If substantial evidence supports the ALJ's conclusions, the reviewing court cannot reweigh the evidence. Krull v. Colvin, 669 F. App'x 31, 32 (2d Cir. 2016) (explaining that "the deferential standard of review prevents [the Court] from reweighing [the evidence]"). Jones notes that on December 15, 2021, she reported that "reaching behind the back" aggravated her shoulder pain, and that on October 12, 2021, she

reported that she struggled to put on a jacket. R. 1178, 1611. These reports support Jones's argument that she was unable to frequently reach with her right arm after September 1, 2021. But there is also evidence in the record supporting the ALJ's conclusion that Jones *could* reach with her right arm. For example, even when Jones had more limited shoulder movement, she reported that she could "do reaching activities with ease." Id. at 1131. Additionally, none of the medical opinions noted that Jones had non-overhead reaching limitations. Because there exists medical evidence that would allow a reasonable factfinder to conclude that Jones could frequently reach with her right arm, the contrary evidence cited by Jones does not permit the Court to reweigh the evidence and reject the ALJ's RFC determination.

      **B.**      **Jones's Testimony**

Jones also argues that the ALJ improperly ignored her testimony that she is "unable to use her right dominant arm." Pl. Br. at 17. This argument fails for two reasons. First, the argument mischaracterizes Jones's testimony. Initially, the ALJ asked Jones, "What can't you do with your right arm?" R. 52. Jones replied, "I can't carry more than seven pounds in my right arm, I can't lift my hand over my head for too long to wash my hair or to lay it up for more than five minutes. Well, two minutes without me shaking because of the pain." Id. Then, minutes later, the ALJ asked, "It sounds like you basically have no use of your right arm. Is that the case, you basically can't use your right arm, now?" Id. at 55. Jones initially replied, "Yes." But without being asked another question, she immediately clarified, testifying, "No. I can't use it too much because after the surgery I have scar tissue damage. I have the other pain, where the pain is coming form [sic] now." Id. Considering Jones's testimony in its entirety, rather than just one decontextualized excerpt, Jones actually testified that she could use her right arm, albeit with pain and limitations.

Second, even if Jones had testified that she could not use her right arm, the ALJ's failure to consider this evidence when formulating the RFC would not have warranted remand. When the reviewing court can "glean the rationale of an ALJ's decision, [it does] not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983). Remand is not warranted where the reviewing court can "look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." Id. (quoting Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)). There is no medical evidence in the record supporting a claim of Jones's complete inability to use her right arm, and Jones does not point to any. The ALJ found persuasive multiple medical opinions finding that Jones retained some use of her right arm, and Jones does not argue that the ALJ erred by finding those medical opinions persuasive. Accordingly, the Court can easily glean the rationale for disregarding a claim of complete right arm immobility. Remand is therefore not warranted.

## CONCLUSION

Jones's motion is DENIED. The action is DISMISSED with prejudice. The Clerk of Court is respectfully requested to terminate the motions at ECF Nos. 16 and 18.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED:     March 4, 2024
           New York, New York